## THE ADRIATIC.

## THE ST. MICHAEL.

### (District Court, S. D. New York. January 31, 1922.)

**Collision** ⊂⊃83—**Collision between anchored vessels in dense fog held not due to fault of either.**

On cross-libels to recover damages resulting from a collision between two anchored vessels in a dense fog, the vessel which was just coming to anchor *held* not at fault for having started from her pier at a time when the fog was too dense for safety, nor for attempting to anchor on the anchorage ground when she ran into the fog, instead of returning to her slip or anchoring in the channel, and the negligence of the chief officer of the other vessel in himself running forward to release the brake on the windlass and paying out the chain, instead of ordering a seaman stationed by the windlass to do so, *held* not shown to have contributed to the accident, so that there could be no recovery on either the original or cross-libel.

In Admiralty. Cross-libels for collision by the Saint Line, Limited, owner of the steamship St. Michael, against the steamship Adriatic, and by the Oceanic Steam Navigation Company, Limited, owner of the steamship Adriatic, against the steamship St. Michael. Decree rendered, denying recovery on both libel and cross-libel.

Decree affirmed 287 Fed. 259.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (W. H. McGrann, of New York City, of counsel), for The St. Michael.

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark and J. Harvey Turnure, both of New York City, of counsel), for the Adriatic.

MACK, Circuit Judge. Cross-libels for damage resulting from a collision between the steamship Adriatic and the steamship St. Michael on the afternoon of November 29, 1919. The collision occurred just south of the Statue of Liberty, at about 4:48 p. m. in a dense and almost unprecedented fog that overhung New York Harbor.

The steamship Adriatic left Pier 60, at the foot of West Twentieth street, about a quarter past 3. The weather was then foggy and misty, but it was possible, it seems, to see the New Jersey coast on the opposite side of the North River, and the steamship Mauretania and the steamship Minnekahda apparently could be seen steaming out a mile below. As the Adriatic steamed down near the Battery, the fog thickened so that it became impossible for the master on the bridge to see his chief officer on the stemhead about 200 feet away. The master and pilot decided that it would be too dangerous to proceed to sea, and determined to anchor south of the Statue of Liberty.

The steamship St. Michael was already lying at anchor within the prescribed anchorage grounds south of the Statue, but of course was not visible to the Adriatic. "As sounds from the Mauretania were heard on the port bow, and the fog was so thick that it was impossible

to know just how near the Mauretania was, the pilot and master decided," as is stated in the brief for the Adriatic, "to anchor westward of the Mauretania, allowing the Adriatic's stern to swing to westward in order to avoid danger of collision with the Mauretania, which it was known had just anchored close by." The Adriatic's starboard anchor was let go on 45 fathoms of chain, but her starboard engine was still moving ahead, and the boat was swinging starboard as the collision occurred between the St. Michael's stem and the starboard quarter of the Adriatic, about 126 feet from her stern.

While there are several charges of fault made against the Adriatic, libelant relies chiefly upon the charge that it was improper for the Adriatic to leave her dock in the face of the threatening fog. While it might have been the part of prudence for the Adriatic to have inquired as to conditions about the Battery before she started down the river, still I am not satisfied by the evidence that the conditions about Pier 60 were so threatening at the time, taking into consideration that the Mauretania, an even larger ship, was steaming out some distance below, as to justify my holding her failure so to inquire to be negligence. And when she reached the Battery and found the extreme fog moving northward, she was fully justified in proceeding on and anchoring near the Statue of Liberty, rather than to return to her dock, 2½ miles to the north, or to anchor in the river. Furthermore, I can find no evidence either of failure to keep a proper lookout or of excessive speed.

With the Mauretania anchoring presumably to the eastward, she was practically compelled to swing to the westward; this she did with all due caution, in view of the conditions. Even if the St. Michael, a properly anchored vessel, were without fault, the Adriatic, though the moving vessel, could not in the circumstances be deemed guilty of negligence.

The alleged fault of the St. Michael is ascribed to her failure to maintain a proper lookout and to pay out her chain promptly. The chief officer was standing on the bridge, and a seaman was stationed on the forecastle head near the windlass, whose duty it was to ring the fog bell and maintain a lookout. It might have been better, in such a dense fog, for a special lookout to have been maintained; but I am not satisfied that the failure of the St. Michael so to do was negligence. It seems that the seaman in the forecastle scarcely observed the sudden emergence of the "city of lights" 50 feet away, until after the chief officer, 110 feet further away on the bridge, saw them; still I am not satisfied that negligence on his part, contributing to the accident, was thereby established. The fog was so dense that the officers of the Adriatic feared to swing to the eastward, because they knew the Mauretania was near, although they admitted they could not see any of her many lights. Nor am I convinced that, if the seamen had reported the lights a few seconds earlier, the accident could have been avoided.

All agree that in the circumstances the windlass of the St. Michael should have been released and the chain paid out as promptly as possible, in the hope that the anchored ship would swing with the tide away from the approaching vessel. The chief officer could have ordered the

lookout, who was standing on the forecastle by the windlass, to do this. Instead of doing so, he, in the excitement of the moment, decided to attend to the matter himself. So he rushed from the bridge, passed the captain's room directly below, stopped to tell him and the pilot that a city of lights was upon them, then rushed down on the deck and ran 110 feet, climbed up the forecastle, and released the brake.

There was in this undoubtedly lost motion and lost time. Whether or not it was a mere error of judgment or negligence, is the question. In my judgment, it was negligence. The officer knew the importance of time. If the lookout was deemed incompetent promptly to obey the proper order, then he should never have been stationed there, for, in a fog, the possibility of having to release the brake quickly was clear to all. But whether this negligence actually contributed to the collision is, at the best, doubtful. The burden is on the cross-libelant to establish that it did. I am not satisfied on this record, in view of the Adriatic's own officer's testimony, that the lost time was sufficient to have enabled the St. Michael, through the prompter release of the brake, to have cleared the approaching Adriatic.

In these circumstances, there can be no recovery on either the libel or the cross-libel.